No. 95-210

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

FRANK FUHRMANN,

      Defendant and Appellant.



APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Maurice R. Colberg, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          William F. Hooks, Appellate Defender Office, Helena,
Montana

      For Respondent:

          Joseph P. Mazurek, Attorney General, Pamela P.
Collins, Assistant Attorney General, Helena,
Montana; Dennis Paxinos, Yellowstone County
Attorney, Daniel Schwarz, Deputy Yellowstone County
Attorney, Billings, Montana

Submitted on Briefs:  July 11, 1996

Decided:  October 18, 1996

Filed:

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Appellant Frank Fuhrmann (Fuhrmann) was charged by information filed in the Thirteenth Judicial District Court, Yellowstone County, with one count of deliberate homicide. After a jury trial, Fuhrmann was found guilty of the crime charged and sentenced to a term of years at the Montana State Prison. Fuhrmann appeals.

We affirm.

Fuhrmann raises two issues on appeal:

1. Did the District Court err in admitting hearsay testimony of statements made by the victim?

2. Did the District Court err in denying Fuhrmann's motion for a change of venue?

**FACTS**

This case arose out of a series of events that occurred in Billings, Montana on the evening of July 7, 1993 and into the early morning hours of July 8. At about 7:30 p.m. on July 7, the victim, Charlie Turner (Turner) was given a ride by a friend to the tattoo parlor operated by Fuhrmann. Fuhrmann and Turner had begun a relationship three months earlier when Fuhrmann gave Turner a tattoo in exchange for Turner's promise to do odd jobs around the tattoo parlor and help with Fuhrmann's window washing business. When Turner arrived at the tattoo parlor that evening, he and Fuhrmann discussed the rumor that marijuana plants were growing on the Rimrocks area north of Billings. They decided to drive up to investigate. Turner was a 15 year old boy, Fuhrmann a 32 year old adult.

2

On the way to the Rimrocks, Fuhrmann stopped at his apartment to gather a flashlight, a plastic garbage bag, a blanket, and a Kershaw knife. A Kershaw knife is unique in that different style blades can be inserted into the handle. Fuhrmann chose a fillet blade, inserted it into the handle, and placed the knife in an inside pocket of the black leather jacket he was wearing. Fuhrmann stated that he brought the knife to cut the marijuana plants. Fuhrmann did not inform Turner that he was carrying the knife.

Fuhrmann drove them up to the Rimrocks and parked his car near Swords Park. The two then walked to an area of cliffs overlooking Alkali Creek. There, according to Fuhrmann, they sat on a boulder, smoked cigarettes, and decided that they would search for the marijuana plants the next day during daylight hours. They then began to walk back to Fuhrmann's car, with Turner in the lead. Fuhrmann was carrying the knife in one hand, the other items in his other hand. Fuhrmann contends that they had not gone more than a few steps when Fuhrmann fell forward, his momentum causing the knife in his outstretched hand to plunge into Turner's upper right buttock.

According to Fuhrmann, Turner turned around and exclaimed "you have a knife?" then ran off in the direction of Airport Road, the main thoroughfare on top of the Rimrocks. Turner began trying to flag down passing vehicles. Fuhrmann caught up with Turner at the edge of Airport Road, where Fuhrmann contends he offered Turner the knife, handle first, as a gesture of peace. Fuhrmann maintains that Turner grabbed the knife, slashed Fuhrmann across the face,

3

and would have inflicted more damage had Fuhrmann not disarmed Turner during an ensuing struggle. The drivers of vehicles that passed by the scene on Airport Road that night provide information to complete the story of these events.

Dorothy Semmann, who had just left Deaconess Hospital at 11:30 p.m. following her work shift as a nurse, was the first witness on the scene. Ms. Semmann was driving near Alkali Creek on Airport Road when she saw a young man appear from the side of the road into the light cast by her headlights, waving his hands. Her urge to stop to help ended abruptly when she saw another man approaching from the side of the road and she thought she was the intended victim of a car-jacking. Ms. Semmann drove home and called 911. She had not seen blood on either of the men.

Chelsea Kenyon and her friend Amy Vicars were also driving on Airport Road in the area of Alkali Creek that night when two men ran on to the road, the younger of whom approached Ms. Kenyon's driver's side window. Ms. Kenyon became frightened and drove on, but curiosity overcame her after a couple of minutes so she drove back to determine what was happening. Ms. Kenyon had not seen blood on either of the men.

When Ms. Kenyon returned, she saw the younger man lying in the road. Two other motorists, Clark Allard and Terrill Bracken, had stopped and were attending to the younger man, Turner. At this point, Ms. Kenyon observed that Turner was lying in a pool of blood, was having difficulty breathing, and was continuing to bleed profusely.

4

Mr. Allard had arrived at the scene moments before Ms. Kenyon's return. Mr. Allard slowed his car after he saw two men in the road, one lying on the ground, the other standing above him with one hand holding the prone man's left leg and the other hand, Allard testified, making a backhand slashing motion over the prone man's body. As Mr. Allard pulled along side the men, he heard the prone man, Turner, say "Help me. Help me. He stabbed me." Mr. Allard stopped his car, got out, and began to approach the men, but hesitated after Fuhrmann began walking toward him with a knife in his hand. Mr. Allard then flagged down a passing car driven by Mr. Bracken.

Mr. Bracken disarmed Fuhrmann while Mr. Allard applied pressure to Turner's numerous stab wounds. At this time, Bracken, Allard, Ms. Kenyon, and Tisha Pfieffer, another motorist who had stopped at the scene, were all witness to statements made by Turner concerning the cause of his injuries: Turner stated that Fuhrmann stabbed him "on purpose," and that the stabbing was "no accident." The admissibility of these statements is the subject of the first issue Fuhrmann raises on appeal.

Turner was rushed to Deaconess Hospital, and was unconscious and in shock upon arrival. After more than three hours of surgery, doctors were still unable to stop Turner's vigorous bleeding. Turner's massive blood loss caused him to suffer cardiac arrest at about 9:00 a.m., July 8. Turner was pronounced dead at 9:37 a.m. Attending doctors had discovered a dozen separate stab wounds, the most serious of which were a deep wound in Turner's right buttock

5

and a longer slash across the inner part of his upper right arm which severed his brachial artery. The State offered expert testimony at trial that the wound to Turner's buttock was nearly 5 inches deep, and that the configuration of the wound suggested that a knife had been inserted and withdrawn in two separate motions. Many of the other wounds were characteristic of wounds received by a person attempting to defend himself from a knife attack.

Fuhrmann was charged by information filed on July 13, 1993, in the Thirteenth Judicial District Court, Yellowstone County, with deliberate homicide. Fuhrmann pleaded not guilty to the crime charged, and subsequently raised the defense of justifiable use of force. Prior to trial, Fuhrmann filed a number of motions in limine. Most importantly for our review was his motion to exclude testimony concerning remarks made by the victim, Turner, to the effect that Fuhrmann's actions were on purpose or not an accident. The District Court admitted the testimony, and after a jury trial that began March 7, 1994, Fuhrmann was found guilty of the crime charged.

About a week after the conclusion of the trial, Chief Deputy County Attorney Daniel Schwartz received a call from the jury foreman, who wanted to discuss the case. During their conversation, Schwartz discovered that one of the jurors had conducted an experiment during the course of the trial. Schwartz immediately notified the court and defense counsel, and after a hearing, the court granted Fuhrmann's motion for a new trial.

Before his second trial, Fuhrmann moved the court for a change of venue due to the publicity his case was receiving in the community of Billings. Fuhrmann informed the court that he had received three separate death threats, all prior to his first trial. The court denied Fuhrmann's motion. Fuhrmann also renewed the motions in limine he had filed prior to his first trial. Again, the court denied Fuhrmann's motion to exclude testimony concerning statements made by Turner regarding Fuhrmann's actions. At the commencement of Fuhrmann's retrial on October 18, 1994, Fuhrmann again moved for a change of venue. The court denied his motion, and after a jury trial Fuhrmann was found guilty of deliberate homicide and was sentenced to a term of years at the Montana State Prison. Fuhrmann appealed.

### ISSUE ONE

Did the District Court err in admitting hearsay testimony of statements made by the victim?

This Court will not overturn a trial court's evidentiary ruling absent an abuse of discretion. State v. Stringer (1995), 271 Mont. 367, 374, 897 P.2d 1063, 1067; State v. Gollehon (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263. Therefore, we must determine whether the District Court abused its discretion in admitting hearsay testimony of statements made by the victim, Turner.

Fuhrmann argues in his briefs submitted to us that testimony regarding Turner's statements should have been excluded by the District Court because Turner's statements related to Fuhrmann's

state of mind and thus are inadmissible hearsay. In his motion in limine before the District Court, Fuhrmann had two bases for his argument why the hearsay testimony concerning Turner's statements should be excluded. First, Fuhrmann argued that Turner's statements went to Fuhrmann's state of mind, not his own, and thus were inadmissible hearsay. Second, Fuhrmann argued that, under Rules 701 and 704, M.R.Evid., the testimony was inadmissible because it was layperson opinion testimony which addressed the ultimate issue in dispute, ·i.e. Fuhrmann's mens rea. The State responded to the motion on each of these two bases, and the court denied the motion.

On appeal, the State initially presents a procedural argument as to why this Court should not review this issue raised by Fuhrmann. The State contends that Fuhrmann has a different basis for his argument on appeal than he did at the District Court level. The State is correct in asserting that this Court adheres to the rule that "a party may not change the theory on appeal from that advanced on the District Court." State v. Henderson (1994), 265 Mont. 454, 458, 877 P.2d 1013, 1016. However, Fuhrmann's argument before this Court, that Turner's statements are inadmissible hearsay because they relate to Fuhrmann's state of mind, is one of the two arguments that Fuhrmann raised at the District Court level.

While Fuhrmann's argument below did not cite Rule 803(3), M.R.Evid., specifically, it clearly referred to that Rule's "state of mind" exception to the hearsay rule. Fuhrmann points us to two federal cases interpreting Rule 103(a)(1), Fed.R.Evid., identical

8

in substance to Rule 103(a)(1), M.R.Evid., which hold that specific objection is required "only where the specific ground would not be clear from the context." Werner v. Upjohn Co., Inc. (4th Cir. 1980), 628 F.2d 848, 853; *see also* United States v. Musacchia (2d Cir. 1990), 900 F.2d 493, 497. Moreover, this Court has approved the use of a motion in limine to preserve an objection for appeal, State v. Weeks (1995), 270 Mont. 63, 85, 891 P.2d 477, 490 (citing State v. Brown (1984), 209 Mont. 502, 506-07, 680 P.2d 582, 584-85), provided the objecting party makes the basis for his objection clear to the district court. Weeks, 891 P.2d at 490.

In his Fifth Motion in Limine, dated March 4, 1994, Fuhrmann states:

> The statements attributed to Turner relate to the alleged state of mind and intent of Fuhrmann. While a witness can testify about his/her state of mind, that witness cannot testify about the state of mind of another. The court has to ask itself the question, 'If a witness were asked, "Did he do it on purpose?", would the court allow the witness to answer the question?'

The District Court did not formally rule upon this motion prior to Fuhrmann's first trial. However, Fuhrmann renewed all of his motions in limine prior to his retrial. At that time, the District Court denied Fuhrmann's Fifth Motion in Limine, but noted Fuhrmann's objection to the admission of the statements and relieved him of any obligation to object again at trial. We conclude that the basis for Fuhrmann's argument in his motion in limine was clear. His argument before us is grounded in the same theory as was his argument below. Fuhrmann properly preserved his objection and it is appropriate that we review it.

9

Fuhrmann contends that testimony by those who witnessed Turner state that Fuhrmann stabbed him "on purpose" and that the stabbing was "not an accident" is inadmissible hearsay and should have been excluded by the District Court. Hearsay is

> a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Rule 801(c), M.R.Evid. Generally, hearsay is inadmissible, but the rules of evidence provide certain exceptions. Rule 803(3), M.R.Evid. provides an exception for

> [a] statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed.

Fuhrmann argues that because Turner's statements regarding Fuhrmann's intent address Fuhrmann's state of mind, the statements do not fall within the exception provided by Rule 803(3) and therefore any testimony concerning these statements is inadmissible hearsay. Fuhrmann also argues that Turner's statements that Fuhrmann purposely stabbed him are statements of belief to prove the fact believed, precisely what is disallowed by the last clause in the text of Rule 803(3).

The State argues that Turner's statements do address his own state of mind, and thus fit within the hearsay exception provided by Rule 803(3). The State contends that by claiming justifiable use of force, Fuhrmann opened the door for the State to rebut his defense with Turner's statements, which indicated Turner's fear of

10

Fuhrmann and that Turner did not believe that he initiated or provoked the stabbing. The State cites State v. Losson (1993), 262 Mont. 342, 348, 865 P.2d 255, 258, and State v. Magruder (1988), 234 Mont. 492, 496, 765 P.2d 716, 719, to support its contention.

The State also raises alternative arguments, that Turner's statements fit within two other exceptions to the hearsay rule. We decline to discuss these arguments, as the record reveals that the State has raised them for the first time on appeal. Henderson, 877 P.2d at 1016.

Some of the analysis and logic in the arguments proposed by both Fuhrmann and the State is creative, but not entirely correct. Both the State and Fuhrmann cite Magruder and Losson in their respective briefs, and both failed to discuss important points raised in those cases.

In Magruder, this Court affirmed the district court's admission of testimony of a victim's statements. The victim's daughter testified that the victim "seemed worried after the [telephone] conversation [with the defendant] and told her that he'd better be 'packing a piece' because Mr. Magruder would be packing a piece and would be [at their home] later." Magruder, 765 P.2d at 717. The majority concluded that the victim's statements avoided the hearsay bar because they fit within the "state of mind" exception provided by Rule 803(3), M.R.Evid. The majority determined that the statements were evidence of the victim's state of mind, that he was afraid of the defendant. Magruder, 765 P.2d at 718-19. Defendant had raised the defense of justifiable use of

11

force, and the majority concluded that evidence that the victim feared the defendant was relevant. <u>Magruder</u>, 765 P.2d at 719 (citing United States v. Brown (D.C. Cir. 1973), 490 F.2d 758, 767). The majority pointed out that the statements were not offered for their truth, but only to show the victim's state of mind. In support, the majority noted that the district court had given a limiting instruction to the jury, that the testimony was

> not offered to prove the truth of the matter asserted, but rather to show the victim's then existing state of mind. You are to consider the statements only in regard to the victim's state of mind and for no other purpose.

<u>Magruder</u>, 765 P.2d at 718.

The dissent in <u>Magruder</u>, which relied heavily on <u>Brown</u>, 490 F.2d 758, stated that "the majority's handling of the hearsay problem skims too lightly over the very problematic nature of the testimony." <u>Magruder</u>, 765 P.2d at 720 (Sheehy, J., dissenting). The dissenting justices were concerned that the testimony, if it indeed was admissible under the "state of mind" exception to the hearsay rule, was in any event so prejudicial to the defendant as to be incurable by the court's limiting instruction. <u>Magruder</u>, 765 P.2d at 720-21 (Sheehy, J., dissenting). Although the following point was not raised in the dissent, after our review of <u>Magruder</u> we note that while the majority on the one hand concluded that the victim's statements fit within the "state of mind" *hearsay exception*, <u>Magruder</u>, 765 P.2d at 718, it on the other hand concluded that the statements were *not offered for their truth*, but only to show the victim's state of mind. <u>Magruder</u>, 765 P.2d at

12

719. In *Losson*, a later case, this Court cleared up this discrepancy.

In *Losson*, where the defendant raised the defense of justifiable use of force, we affirmed the district court's admission of testimony of the victim's statements. The victim's statements, like the victim's statements in *Magruder*, indicated his fear of the defendant. We concluded that the statements were relevant, *Losson*, 865 P.2d at 258, and then analyzed their admissibility under the hearsay rule. Citing *Brown*, 490 F.2d at 762-63, we stated:

> That court delineated the distinction between hearsay and non-hearsay as it related to state of mind evidence. *The distinction turns on whether the statement is evidence which directly proves the declarant's state of mind or whether the statement is evidence which circumstantially proves the declarant's state of mind.*

*Losson*, 865 P.2d at 259 (emphasis added).

The testimony at issue in *Losson* involved three statements made by the victim. The victim had stated that the defendant "threatened to kill him in the past," and that the defendant "would kill him if he ever moved out." We concluded that "these statements circumstantially indicated [the victim's] state of mind toward [the defendant]; that he feared her." *Losson*, 865 P.2d at 259. We explained further:

> The jury was instructed not to consider whether [the defendant], in fact, threatened to kill or would kill [the victim]. Instead, the jury was instructed to consider [the victim's] state of mind; whether he was afraid of [the defendant]. We hold that the first two statements were not hearsay.

13

Losson, 865 P.2d at 259.

We concluded that the third statement made by the victim in Losson was direct evidence of the victim's state of mind. The third statement was that the victim "was afraid of his wife and thought she was going to kill him." Since the statement contained direct evidence of the victim's state of mind, we determined that the State necessarily was offering the statement for its truth, and that the statement therefore was hearsay. Losson, 865 P.2d at 259. However, we held that the statement fit into the exception provided by Rule 803(3) and was admissible. Losson, 865 P.2d at 259.

Based upon our analyses in Magruder and Losson, we reach the following conclusions in the instant case. First, Turner's statements that Fuhrmann stabbed him "on purpose" and that the stabbing was "not an accident," if they can be construed as providing evidence that Turner feared Fuhrmann, can only be construed as providing circumstantial evidence of Turner's fear. Under that construction, the statements would be considered non-hearsay and would be admissible. Losson, 865 P.2d at 259. However, such statements must be offered only for the purpose of showing the declarant's state of mind, and may not be offered for the truth of the matters asserted. Where we have upheld a district court's admission of such statements, we have considered the fact that the district court issued a limiting instruction to the jury explaining the purpose for which it could consider the statements. Magruder, 765 P.2d at 718; Losson, 865 P.2d at 259.

14

After reviewing the record in the instant case, we find no indication that the District Court, in denying Fuhrmann's motion to exclude testimony regarding Turner's statements, limited the purpose for which the testimony could be offered. For that matter, there is nothing in the record which would explain why the District Court admitted the testimony at all. More importantly, the transcripts reveal that the District Court did not at any time issue limiting instructions to the jury explaining why the testimony was being offered.

To prevent any potential prejudicial effect on a defendant, and to uphold the integrity of both the hearsay rule and Rule 803(3)'s "state of mind" exception, a trial court must instruct the jury as to the limited purpose for which it may consider this type of testimony. However, both the trial court and this Court must keep a vigilant eye toward the possible prejudicial effect of such testimony even if a limiting instruction is given.

We hold that the District Court abused its discretion in admitting testimony of Turner's statements without also giving a limiting instruction as to why the testimony was being offered and how the jury was to consider it. However, we consider this error to be harmless, due to the independent evidence in the record upon which a jury could base a guilty verdict: Turner had been stabbed at least twelve times; one of Turner's most serious wounds, the wound to his buttock, was received before he and Fuhrmann reached the Airport Road; and, the description of the wound to Turner's buttock given by his attending physicians and by a State crime lab

expert was inconsistent with Fuhrmann's claim that he accidentally stabbed Turner when he tripped and fell forward with a knife in his outstretched hand.

Our conclusion that the District Court's error was harmless is consistent with this Court's previous holdings regarding the harmless error doctrine. Where federal constitutional error, such as improper jury instruction, is involved, we have applied the harmless error rule established by the United States Supreme Court in Chapman v. California (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-11: for error to be harmless, it must be shown beyond a reasonable doubt that the error did not contribute to the verdict obtained. State v. Rothacre (1995), 272 Mont. 303, 312-13, 901 P.2d 82, 88; State v. McKenzie (1980), 186 Mont. 481, 532, 608 P.2d 428, 458. In considering the prejudicial effect of a district court's erroneous evidentiary ruling, a matter of state law, this Court has stated that "[t]he essential question is whether there is a reasonable possibility that the inadmissible evidence might have contributed to the conviction." Brodniak v. State (1989), 239 Mont. 110, 115, 779 P.2d 71, 74; State v. Gray (1983), 207 Mont. 261, 268, 673 P.2d 1262, 1266. This Court has noted that the federal harmless error rule and Montana's harmless error rule are essentially the same, and that in either case overwhelming evidence of a defendant's guilt can render harmless a district court's error. McKenzie, 608 P.2d at 458; Brodniak, 779 P.2d at 74. We conclude that there was overwhelming evidence of

16

Fuhrmann's guilt, and that the District Court's error did not contribute to his conviction. We hold that the error was harmless.

**ISSUE TWO**

Did the District Court err in denying Fuhrmann's motion for a change of venue?

This Court will not disturb a district court's denial of a motion for change of venue absent an abuse of discretion. State v. Moore (1994), 268 Mont. 20, 51, 885 P.2d 457, 477 (overruled on other grounds, Gollehon, 906 P.2d 697). Therefore, we must determine whether the District Court abused its discretion in denying Fuhrmann's motion for a change of venue.

Section 46-13-203(1), MCA, states that a defendant is entitled to

> move for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in the county.

Further, a motion for change of venue must be granted

> when it appears there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial.

State v. Link (1981), 194 Mont. 556, 559-60, 640 P.2d 366, 368 (citing People v. Berry (Ill. 1967), 226 N.E.2d 591, 592-93).

Fuhrmann argues that there are three grounds upon which a court could reasonably believe that prejudice actually existed in the Billings community at the time of his retrial. First, Fuhrmann points to three separate death threats that he received prior to

17

his first trial as indicative of the inflamed passions in the community. Second, he claims that the large number of potential jurors excused for cause and the large number of potential jurors who had knowledge of the case prior to the retrial reflected the widespread prejudice in the community. Third, Fuhrmann contends that certain newspaper reports in the *Billings Gazette* constituted prejudicial pretrial publicity and contributed to the community-wide prejudice.

We dispose of Fuhrmann's first ground by noting that the death threats were received prior to his first trial, where Fuhrmann did not move for a change of venue. Fuhrmann does not allege that he received any additional death threats prior to his retrial. As we are reviewing the District Court's denial of Fuhrmann's motion for change of venue in the context of his retrial, we see no need to address this ground.

As to Fuhrmann's second ground, we do not agree that the fact that a large number of potential jurors had prior knowledge of his case is prejudicial and warrants a change of venue. We have held that jurors' knowledge of the case and publicity, without more, is insufficient to warrant a change of venue since it cannot be equated with prejudice. State v. Smith (1986), 220 Mont. 364, 378, 715 P.2d 1301, 1309; see State v. Ritchson (1982), 199 Mont. 51, 55, 647 P.2d 830, 832. Moreover, it appears from the record that the court was particularly careful to question individually those jurors who indicated that they had some prior knowledge of the case, and instructed the potential jurors and the jurors ultimately

18

chosen of their duty to render a verdict based solely on the evidence presented at trial. We see no reason to question the District Court's exercise of discretion in relation to this ground presented by Fuhrmann.

Finally, we cannot agree with Fuhrmann that certain newspaper articles in the *Billings Gazette* constituted prejudicial pretrial publicity and contributed to a community-wide prejudice. A defendant seeking change of venue on the ground of prejudicial pretrial publicity must prove two elements. First, the defendant must show that the publication at issue was inflammatory. Second, the defendant must show that the publication actually inflamed the prejudice of the community to the extent that a reasonable possibility exists that he may not receive a fair trial. Ritchson, 647 P.2d at 832. The first element focuses on the nature of the publicity while the second focuses on the effect. Ritchson, 647 P.2d at 832.

In State v. Nichols (1987), 225 Mont. 438, 734 P.2d 170, we described inflammatory publicity as

> editorializing on the part of the media or any calculated attempt to prejudice public opinion against [defendant] or to destroy the fairness of the pool from which [defendant's] prospective jurors would be drawn.

Nichols, 734 P.2d at 173-74 (quoting State v. Armstrong (1980), 189 Mont. 407, 423, 616 P.2d 341, 350). The District Court read the copies of eleven news reports from the *Billings Gazette* attached to Fuhrmann's motion for change of venue, dated August 19, 1994, and did not discover any instances of "editorializing" or "calculated

19

attempts to prejudice public opinion." The District Court found that the reports merely contained factual accounts of the background of the case as well as the trial proceedings. Fuhrmann notes that some reports contain references to his criminal history and to the prosecution's initial theory that Fuhrmann had sexually assaulted Turner. However, we conclude, as did the District Court, that these bare statements were a part of "standard news accounts of court events and filed information," news accounts that were "devoid of editorializing."

To support his contention that the news reports inflamed the prejudice of the community, Fuhrmann points to the death threats he received prior to his first trial, the number of potential jurors in the jury pool with prior knowledge of the case, and a survey conducted by a Montana State University professor which established the Billings community's awareness of Fuhrmann's case. We have already explained our unwillingness to consider the death threats received prior to the first trial as indicators of alleged prejudice surrounding the retrial some six months later. We have also disposed of Fuhrmann's argument regarding potential jurors with prior knowledge of the case; the record shows that the District Court carefully and thoroughly questioned jurors who admitted to having prior knowledge of the case, and, satisfied with the panel ultimately chosen, instructed that group of its duty to render a verdict based only on evidence produced at trial.

Finally, after reviewing the Montana State University professor's survey, we would have to agree with the District

20

Court's characterization of it: "inconclusive." 81% of the nearly 450 persons questioned in the survey stated that they had heard of Fuhrmann's case. Of that percentage, 49% said they had an opinion of Fuhrmann's guilt or innocence, and the remainder either did not have an opinion or didn't know. Nearly all who had an opinion believed Fuhrmann to be guilty, but only about half claimed it would be very difficult to change their opinion. From the information elicited in the survey we cannot conclude that pretrial publicity inflamed prejudice in the Billings community, especially in light of our determination that the news reports were not facially inflammatory. *See* Moore, 885 P.2d at 478.

We are aware that surveys are appropriate means of determining whether prejudice exists in a community. State v. Paisley (1983), 204 Mont. 191, 194, 663 P.2d 322, 324. Where we have acknowledged a survey's results as supporting a court's grant of a motion to change venue, we have noted the connection between the results of the survey and extensive editorializing by the local newspaper against the defendant. Paisley, 663 P.2d at 324.

In Paisley, a criminologist's survey submitted prior to defendant's justice court trial concluded that the likelihood of defendant receiving a fair trial depended upon the extent of further trial publicity. The justice court trial received "editorialized" publicity, and defendant's motion for change of venue of his district court trial was granted by the district court and affirmed by this Court. Here, we conclude that there was no editorializing by the *Billings Gazette* against Fuhrmann. There can

21

be no connection indicating prejudicial publicity--the type of connection we contemplated in Paisley--between the Montana State University survey and the *Gazette* news reports. *See* Moore, 885 P.2d at 478.

A passage from Moore, where we disagreed with defendant's claim that prejudicial pretrial publicity mandated a change of venue, summarizes our conclusions here:

> Living, as we do, in a society which is continuously inundated with news coverage by the print and broadcast media, it is doubtful that most members of the community will not share some knowledge of, or about, a locally high-profile crime, and the various persons allegedly involved in its commission or its investigation. Given the inevitable conflict with the media's constitutional right to free speech, the public's constitutional right to know, and the accused right to a fair trial, it remains the task of the district court, in such cases, to scrupulously examine the evidence supporting a motion for change of venue to insure that the jurors who will ultimately decide the guilt or innocence of the accused are fair minded and uninfluenced by what they may have seen, heard, or read. That conclusion must necessarily be based upon not only the jurors' responses in voir dire, but also on a careful analysis of the quantity and content of the pretrial publicity. Each case is unique and must be decided on its own merits. *Bousquet*, 808 P.2d at 508. While this was a difficult case, we are nonetheless satisfied that the trial judge conscientiously considered this issue, and that despite the pervasiveness of the media coverage, it was generally balanced and fair. We conclude that the jurors who decided [defendant's] fate were not disposed to guilt or innocence by what they may have seen, heard, or read in the media.

Moore, 885 P.2d at 479. The standard that must be met in order for a change of venue motion to be granted is the existence of "reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial

22

trial." Link, 640 P.2d at 368 (citation omitted). After reviewing the record, we hold that the District Court did not abuse its discretion when it denied Fuhrmann's motion for change of venue, impliedly concluding that such reasonable grounds did not exist.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices