No. 00-792

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 244N

STATE OF MONTANA,

Plaintiff/Respondent,

v.

ANTHONY PIERRE MILLER,

Defendant/Appellant.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

R. Stan Peeler, Peeler Law Office, Bozeman, Montana

For Respondent:

Mike McGrath, Montana Attorney General, John Paulson, Assistant Montana Attorney General, Helena, Montana; Marty Lambert, Gallatin County Attorney, Todd Whipple, Deputy Gallatin County Attorney, Bozeman, Montana

Submitted on Briefs: May 17, 2001

Decided: December 5, 2001

Filed:

_____

Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Following a two-vehicle accident, Anthony Miller (Miller) was charged with negligent homicide and driving while his license was suspended or revoked. In a pre-trial motion, Miller sought to exclude evidence, namely his blood test results and statements he gave to an investigating officer. In its ruling, the District Court granted Miller's motion in part, holding that evidence of the presence of alcohol in Miller's blood was admissible, but suppressing evidence of the precise blood alcohol concentration. However, the court denied Miller's motion to suppress his statements. Miller also sought to change the venue of his trial. This motion was denied by the District Court. Miller appeals these rulings. We affirm.

¶3 We restate the issues as follows:

1. Whether the District Court erred in not suppressing Miller's blood test results in their entirety;

2. Whether the District Court erred in denying Miller's motion to suppress his statement to the investigating officer; and

3. Whether the District Court erred in denying Miller's motion for a change of venue.

## FACTUAL BACKGROUND

¶4 On March 20, 2000, at approximately 10:20 p.m., Miller was driving westbound on Spur Road towards Big Sky, Montana. While negotiating a curve, Miller crossed the centerline into an oncoming car. Miller's vehicle struck the eastbound car on the driver's side. The driver of the eastbound vehicle eventually died as a result of the injuries she received in the accident.

¶5 Montana Highway Patrol Officer, Derek Browning (Browning) and Montana Highway Patrol Sergeant, Keith Edgell (Edgell) responded to the scene of the accident and made contact with Miller who was in an ambulance being evaluated for injuries. Browning observed that Miller's eyes were watery and red, his speech was slurred, he appeared very disoriented and confused, and that there was a strong odor of alcohol coming from Miller's person. Browning asked Miller if he had anything to drink, and Miller stated he had had a few drinks. Miller was asked to perform the horizontal gaze nystagmus (HGN) test, which Browning administered. Browning took photographs of the scene and later asked Montana Highway Patrol Officer Jason Hoppert (Hoppert) to go to Bozeman Deaconess Hospital and obtain a blood sample from Miller, since Browning believed Miller was intoxicated.

¶6 Approximately two and a half hours after the accident, two blood samples were drawn from Miller at the hospital. Lab technician, Cole Young (Young) took the samples. At approximately 1:00 a.m., Young drew a sample of Miller's blood under the direction of the attending emergency room physician. Young later analyzed this sample which indicated a blood alcohol content (BAC) of .22.

¶7 Officer Hoppert requested Young take a sample of Miller's blood, pursuant to the implied consent law. Young drew this second sample from Miller at approximately 1:05 a. m., and filled out and signed the blood test request form, indicating proper procedures were used. Officer Hoppert took the sample to the crime lab for analysis, which showed a BAC of .19.

¶8 Young testified that he works under the direct supervision of an emergency room physician and that he has twelve years of experience in medical lab work. He testified to taking thousands of blood samples, and always following established procedures for all blood draws. Young did not recall if the supervising physician was in the room when he

took the samples of Miller's blood.

¶9 At approximately 2:15 a.m., Edgell interviewed Miller at the hospital. Miller was not under arrest at this point, but was strapped to a gurney waiting to be cleared by the physicians for any spinal injuries. Officers Browning and Hoppert were also in the room, observing the interview for training purposes. After noting the time, place and date of the interview and asking Miller his address, Edgell informed Miller of his *Miranda* rights, which Miller indicated he understood. The following conversation then took place:

> Edgell: Okay. Having your rights in mind, would you be willing to answer a few questions in relation to the accident tonight?
>
> Miller: (garbled)
>
> Edgell: Well, I'll ask you the questions and we'll just see if you can answer yes or no for me. How about that?
>
> Miller: Okay.
>
> Edgell: Okay?
>
> Miller: I would prefer to answer all the questions when I'm completely rested and . . .
>
> Edgell: Right well and that's fine we . . .
>
> Miller: I'm not (garbled)
>
> Edgell: Sure. And I understand that. You know, and what we'll do is . . .
>
> Miller: (garbled) stuff like that and I don't feel too good.
>
> Edgell: Tony, what we do though, is we try to get the questions asked as close to the time of the accident as we can. Alright? And then once . . . once you're feeling better, what we'll do is we'll come down and we can do a second interview with you then. And we can clarify anything else that you might be having questions about. Alright? Would you be willing to try to answer a few questions right now?
>
> Miller: Yeah. I could try.

¶10 Edgell went on to interview Miller for approximately ten minutes. Miller told Edgell that the eastbound car veered into his lane and that he had tried to avoid a collision. Miller chose not to answer any questions in relation to where he'd been drinking or how much he had to drink.

¶11 Miller filed a motion to suppress, or in the alternative, a motion in limine, moving the court to suppress and/or exclude the testimony in reference to the HGN test, both blood test results, photographs of the victim at the scene, and Miller's statement to Edgell. The State agreed not to introduce either the victim photographs or testimony about the HGN.

¶12 In his motion, Miller asserted the State could not meet the proper foundational requirements for the blood tests and they should not be admitted. Miller further contended that his statement to Edgell at the hospital was involuntary, arguing that his statement that he preferred answering the questions when he was completely rested, was the equivalent of stopping the interview. Miller also filed a separate motion for change of venue based on publicity arising from three articles published in the local paper.

¶13 The State responded that evidence from both blood draws was admissible because the technician who drew them was competent, qualified, and followed the necessary procedures. The State also cited *State v. Thompson* (1984), 207 Mont. 433, 674 P.2d 1094, for the proposition that the implied consent statute did not apply to negligent homicide prosecutions. As to the voluntariness of Miller's statements to Edgell, the State asserted Miller voluntarily answered the questions after being informed of his rights under *Miranda*. The State contended Miller's statement about preferring to answer questions after he was rested did not constitute a refusal to answer. The State also noted Miller did not answer each question the officer asked him, thus arguing Miller voluntarily and selectively responded to the questions. In response to the motion for change of venue, the State asserted Miller failed to prove the publicity was inflammatory or that it caused such prejudice in the community that Miller could not receive a fair trial.

¶14 At the hearing on Miller's motion to suppress, the court heard testimony from the lab technician, Young, as well as Officers Browning, Hoppert, and Edgell, who played the tape of his interview with Miller. The court also heard testimony from Phillip Lively (Lively), Director of the Breath Analysis Program for the State of Montana, via the telephone. Lively testified that it was scientifically improper to use the results of a later blood test to estimate what a person's exact BAC might have been earlier (i.e., "back-

extrapolation of alcohol results"). However, Lively noted that a later blood test could substantiate observations and assessments of a person's state of intoxication at the scene. In addition, Lively testified that the test results accurately reflected Miller's BAC at the time his blood was drawn.

¶15 At the conclusion of the hearing the District Court heard oral arguments from the parties. In its findings of fact, the court found there was no dispute as to the procedures used by Young, and that although it is scientifically improper to use the results of a later blood test to estimate what a person's earlier BAC might have been, a later blood test could be useful to support the assessment and observations of the officers at the scene. The court further found that Miller was properly advised of his *Miranda* rights, he did not unequivocally exercise his right not to talk, and his statements to Edgell were made voluntarily. Finally, the District Court found the articles from the local paper did not show excessive publicity or editorializing on the part of the newspaper. The court noted any potential for bias or prejudice could be dealt with during voir dire.

¶16 The District Court denied Miller's motion for change of venue and motion to suppress his statements to the officer. The court granted Miller's motion to suppress the blood tests in part, by allowing the State to only introduce evidence that the blood tests were positive for alcohol, but excluding the exact BAC results, as well as the fact that the BAC amounts were greater than the legal limit. In its conclusions, the District Court did not distinguish between the blood sample taken for medical purposes and the sample taken under the implied consent law.

¶17 Miller plead guilty to negligent homicide and driving while his license was suspended, and reserved the right to appeal the District Court's rulings on his pretrial motions.

## STANDARD OF REVIEW

¶18 We review a district court's denial of a motion to suppress to determine if "the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law." *State v. Weaselboy*, 1999 MT 274, ¶ 6, 296 Mont. 503, ¶ 6, 989 P.2d 836, ¶ 6 (citation omitted). A district court's decision to deny a motion for a change of venue is reviewed for an abuse of discretion. *State v. Abe*, 1998 MT 206, ¶ 34, 290 Mont. 393, ¶ 34, 965 P.2d 882, ¶ 34 (citation omitted).

## DISCUSSION

# Issue 1

**¶19 Did the District Court err in not suppressing Miller's blood test results in their entirety?**

¶20 Miller argues that neither the foundation or competency of the blood samples was established, claiming that Young was not a physician, registered nurse, or qualified person under their direction as required under § 61-8-405, MCA. Miller also argues that because extrapolation back to Miller's BAC at the time of the accident is impossible, the test results of blood taken from Miller over two hours and forty minutes later should not be admitted because they are not competent. The State counters that § 61-8-405, MCA, does not apply to offenses such as negligent homicide, and in the alternative, the State asserts Young met the necessary qualifications to draw blood under §§ 61-8-404 and -405, MCA.

¶21 A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *State v. Gallagher*, 2001 MT 39, ¶ 5, 304 Mont. 215, ¶ 5, 19 P.3d 817, ¶ 5 (citation omitted).

¶22 Under Montana's implied consent laws, blood sample evidence is admissible when it was drawn from the defendant by a competent and qualified person. Section 61-8-404(1)(b)(ii), MCA. A qualified person is defined in § 61-8-405, MCA, as "a physician or registered nurse, or other qualified person acting under the supervision and direction of a physician or registered nurse."

¶23 At the suppression hearing, the District Court heard testimony from Young, the lab technician who took the samples of Miller's blood. Young, an experienced certified clinical lab scientist, testified he worked under the direct supervision of the emergency room physician, that he had done thousands of blood draws, and that he always follows established procedures. The court found that the proper checklist for the legal draw was completed by both Young and Hoppert, and that there is no dispute as to Young's technical procedures. The court also found, based on Lively's testimony, that later blood tests are useful in substantiating any earlier observations made of a person suspected of being under the influence.

¶24 In its conclusions of law, the District Court did not distinguish between the sample

taken for medical purposes and the sample taken pursuant to the implied consent law. The court reasoned that because the actual BAC results could not be used to extrapolate an estimated earlier BAC, the exact BAC results should be suppressed. However, the court did find that the samples were collected by a qualified medical technician, and therefore allowed evidence as to presence of alcohol in Miller's blood.

¶25 We conclude that the District Court's findings were supported by substantial credible evidence, and the court did not misapprehend the effect of the evidence, particularly since the exact BAC results were suppressed by the court. Young was clearly qualified to draw Miller's blood, as he was an experienced lab technician acting under the direct supervision of the emergency room doctor. Once the trial court found the samples were collected by a qualified medical technician, the court could have admitted the BAC results in their entirety. The competency of the blood sample evidence is not affected by Lively's opinion that back extrapolation of a person's BAC is scientifically improper. Rather, the significance of the time lapse between the accident and the collection of a sample can be argued by the parties, and goes to the weight of the evidence, which is the province of the trier of fact. *State v. Weitzel*, 2000 MT 86, ¶ 20, 299 Mont. 192, ¶ 20, 998 P.2d 1154, ¶ 20. The District Court, however, suppressed the results, which inured to Miller's benefit. Accordingly, we cannot find the District Court erred in simply admitting evidence as to the presence of alcohol in Miller's blood at the time the blood samples were drawn.

## Issue 2

¶26 **Did the District Court err in denying Miller's motion to suppress his statement to the investigating officer?**

¶27 Miller contends that once he told Officer Edgell he would prefer to answer questions when he was completely rested, he terminated the interview and that any statement afterward should be suppressed as involuntary and in violation of his Fifth Amendment right against self-incrimination. The State responds that it was reasonable for Edgell not to interpret such a statement as a refusal to answer.

¶28 Prior to any questioning during a custodial interrogation, a defendant must be informed of the right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L. Ed.2d 694, 707. An individual may waive these Fifth Amendment rights only if the waiver has been made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444; *See*

*also State v. Hill*, 2000 MT 308, ¶ 39, 302 Mont. 415, ¶ 39, 14 P.3d 1237, ¶ 39. The question of voluntariness depends on the totality of the circumstances, and under a totality of circumstances test, courts consider the characteristics of the defendant and what transpired during the interview. *Hill*, ¶ 39 (citations omitted).

¶29 At the hearing, the District Court heard testimony as to the setting of the interview and who was present, as well as the taped interview itself. The court found that the interview took place at 2:15 in the morning at the hospital and that Miller was strapped to the gurney since it was not known if he had any spinal injuries. The court also found Miller was properly advised of his *Miranda* rights, and at no time did Miller request an attorney. As to Miller's statement that he preferred to talk when he was rested, the court noted at most this was merely an indication of Miller's preference, and was not an unequivocal exercise of his *Miranda* rights, since he agreed to answer questions after making the statement.

¶30 We conclude there was substantial credible evidence to support the court's conclusion that Miller voluntarily talked with the officer. Miller was properly advised of his *Miranda* rights prior to his interview, and although Miller was confined to a gurney, the interview was not coercive. Miller's statement that he preferred to talk after he was rested was not an unequivocal invocation of his right to remain silent; Miller continued to talk with the officer after making the statement. Also, Miller exercised his right not to answer specific questions about drinking anything prior to the accident. Moreover, at no time did Miller seek to explicitly terminate the interview. We conclude the District Court did not err in refusing to suppress Miller's statements to Officer Edgell.

## Issue 3

¶31 **Did the District Court err in denying Miller's motion for a change of venue?**

¶32 Change of venue is permitted when "there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in the county." Section 46-13-203(1), MCA. We will not disturb a district court's denial of a motion for a change of venue absent an abuse of discretion. *Abe*, ¶ 34. *See also State v. Fuhrmann* (1996), 278 Mont. 396, 408, 925 P.2d 1162, 1169 (overruled on other grounds by *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735).

¶33 The standard for change of venue is whether there is a reasonable apprehension that the defendant cannot receive a fair trial. *Hill*, ¶ 51 (citation omitted). A defendant seeking

a change of venue on the basis of prejudicial pretrial publicity must prove (1) the reports were inflammatory and that (2) they actually inflamed the prejudice of the community to the extent that there is a reasonable possibility he may not receive a fair trial. *Hill*, ¶ 51 (citation omitted); *See also Fuhrmann*, 278 Mont. at 409, 925 P.2d at 1170. A publication may be considered "inflammatory" if it is characterized by "editorializing on the part of the media or any calculated attempt to prejudice public opinion . . . . " *Fuhrmann*, 278 Mont. at 409, 925 P.2d at 1170.

¶34 Citing two newspaper articles and one letter to the editor, published between April 1, 2000 and April 6, 2000, in the *Bozeman Daily Chronicle*, Miller contends a change of venue was warranted. Miller notes that one of the articles reported the exact BAC results, although the District Court later ruled those precise results inadmissible. The article also referred to Miller's "fifth drunken driving charge in ten years." Another article reported similar information and added descriptions of the victim's family and friends being present at the arraignment. The letter to the editor discussed Miller's case in context of the greater societal issue of drinking and driving.

¶35 The District Court found that the evidence presented by Miller did not show excessive publicity, nor did it indicate any editorializing on the part of the newspaper. The court also noted that any bias or prejudice exhibited by potential jurors could be dealt with during voir dire.

¶36 We conclude that Miller failed to satisfy both prongs of the test outlined in *Hill*. The record contains two newspaper articles, which are standard news accounts of events and publicly filed information, and which report the facts of the case with reasonable accuracy. Neither of the news articles contains any "editorializing," or includes any "calculated attempts to prejudice public opinion." The letter to the editor briefly refers to Miller's case, but for the majority of the letter the author presents the greater social problems associated with drinking and driving. We conclude there was no reasonable apprehension that Miller could not receive a fair trial. We therefore agree with the trial court's conclusion that Miller did not meet his burden of showing a need for a change of venue, and conclude the District Court did not abuse its discretion in denying Miller's motion.

¶37 Therefore, we conclude the District Court did not err when it denied Miller's motion to suppress the blood test results and his statements to the officer. Nor did the court err when it denied Miller's motion for a change of venue. Accordingly, we affirm.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

/S/ JIM RICE