

DA 08-0081

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 10N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

MICHAEL H. DITTON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 2007-082 A
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Michael H. Ditton, (Self-Represented), Bozeman, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General, Deborah F. Butler,
Assistant Attorney General, Helena, Montana

            Marty Lambert, Gallatin County Attorney, Matthew B. Lowy, Deputy
County Attorney, Bozeman, Montana

Submitted on Briefs: November 13, 2008

Decided: January 13, 2009

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Pursuant to Section 1, Paragraph 3(d)(v), Montana Supreme Court 1996 Internal Operating Rules, as amended in 2003, the following memorandum decision shall not be cited as precedent. Its case title, Supreme Court cause number and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Michael H. Ditton (Ditton), a self-represented litigant, appeals from his conviction for misdemeanor assault in the Eighteenth Judicial District Court. He presents ten issues on appeal, covering a wide range of subjects related to the proceedings against him. We affirm.

¶3 In the afternoon of September 28, 2006, Ditton went to the Bozeman City Attorney's office in Bozeman, Montana, to pick up discovery materials for a pending DUI trial. According to testimony presented at trial, when Ditton showed up at the office he smelled of alcohol. After Ditton arrived at the office, he walked past the desk of Karen Semerau (Semerau), an executive assistant to the Bozeman City Manager, and approached the desk of Heather Bienvenue (Bienvenue), a legal assistant in the office. Ditton requested his discovery materials and then stated in a loud voice "Well this is a crock," or "That's a bunch of crock."

¶4 While Bienvenue was gathering the discovery requests, Ditton asked if he could speak to Paul Luwe (Luwe), the City Attorney. After Ditton was finished speaking with Luwe, Bienvenue escorted Ditton to the finance counter so he could pay the $6.25 fee for the discovery requests. Bienvenue later testified that she was agitated and nervous while

2

she escorted Ditton. In fact, Semerau and Bienvenue had a discussion about the fact that there were police officers downstairs which could be summoned if Ditton became a concern. While Ditton and Bienvenue waited at the finance counter, Bienvenue claims the Ditton stood close to her and was staring at her. Bienvenue kept facing forward to avoid his stare. Ditton then reached out, poked Bienvenue "really hard" in the arm with his finger and said "Hey, what's your name?" Bienvenue later testified that she found his actions inappropriate and believed they had sexual overtones. Given that Ditton had been drinking and that she was acquainted with Ditton's prior criminal history due to her position in the City Attorney's office, Bienvenue became upset and left the finance counter with the discovery materials in hand.

¶5 Bienvenue returned to her office and handed the discovery materials to Semerau. Semerau later testified that Bienvenue was shaken and upset. Semerau reminded Bienvenue that there were police officers downstairs. Bienvenue proceeded downstairs and told two police officers that she needed their help. The officers ran ahead of Bienvenue to the finance office. When they arrived, Bienvenue told Ditton that the officers would be escorting him out of the building and that he was not to touch her again.

¶6 Officer Jason LaCross (Officer LaCross) and Sergeant Ed Benz (Sergeant Benz) were dispatched to city hall after a report of a disturbance. When they arrived, they saw Ditton with the two officers who had escorted him away from the finance counter. Officer LaCross interviewed Bienvenue concerning Ditton's actions, and noticed that she seemed shaken, but somewhat relieved. Officer LaCross observed Ditton to have a

3

strong odor of alcohol emitting from his person, and noticed that his eyes appeared glassy and bloodshot. Based on the investigation conducted by Sergeant Benz and Officer LaCross, Ditton was arrested, transported to the Gallatin County Detention Center, and charged with misdemeanor assault and contempt. The criminal contempt charge was based on Ditton's alleged violation of a bail condition concerning alcohol use. The criminal contempt charge was later dismissed.

¶7 Ditton was convicted of misdemeanor assault in Justice Court and appealed his conviction for a de novo trial in the District Court. Prior to trial, Ditton filed a motion to suppress and a motion to dismiss. The District Court held a hearing on the motions and ultimately denied them. The District Court held a one-day bench trial on the misdemeanor assault charge on December 3, 2007. Ditton represented himself. The District Court received testimony from Ditton, Semerau, Bienvenue, Officer LaCross, and Sergeant Benz, and convicted Ditton of the misdemeanor assault charge.

¶8 The misdemeanor assault statute under which Ditton was convicted reads as follows:

> (1) A person commits the offense of assault if the person:
>     (a) purposely or knowingly causes bodily injury to another;
>     (b) negligently causes bodily injury to another with a weapon;
>     (c) purposely or knowingly makes physical contact of an insulting or provoking nature with any individual; or
>     (d) purposely or knowingly causes reasonable apprehension of bodily injury in another.
>     (2) A person convicted of assault shall be fined not to exceed $500 or be imprisoned in the county jail for any term not to exceed 6 months, or both.

Section 45-5-201, MCA.

4

¶9 Ditton first argues that the District Court erred in not dismissing the misdemeanor assault charge after the co-existing charge of criminal contempt was dismissed. Ditton argues that the two charges were part of the same transaction pursuant to § 46-11-503(1)(a), MCA, and that prosecution for contempt bars his subsequent prosecution of criminal assault. However, it is patent that the criminal contempt and misdemeanor assault charges are not motivated by the same purpose in order to accomplish the same criminal objective. *See State v. Condo*, 2008 MT 114, 342 Mont. 468, 182 P.3d 57. Thus, the District Court did not err in denying Ditton's motion to dismiss the assault charge.

¶10 Second, Ditton argues that the facts stated in the complaint were insufficient as matter of law to establish probable cause for the offense of misdemeanor assault. Probable cause is demonstrated when "the facts and circumstances . . . are sufficient to warrant a reasonable person to believe that someone is committing or has committed an offense." *State v. Williamson*, 1998 MT 199, ¶ 12, 290 Mont. 321, ¶ 12, 965 P.2d 231, ¶ 12. A review of the transcripts and the charging document shows that Ditton's contention is without merit. There was ample probable cause to support the charge in this case.

¶11 Third, Ditton asserts there was no particularized suspicion to support his detention by the officers, nor probable cause for his arrest. Particularized suspicion to justify an investigative stop is proven by the presentation of "objective data from which an experienced officer can make certain inferences, and a resulting suspicion that a person is or has been engaged in wrongdoing." *Morris v. State*, 2001 MT 13, ¶ 9, 304 Mont. 114,

¶ 9, 18 P.3d 1003, ¶ 9. "Probable cause exists if, at the time of the arrest, there were sufficient facts and circumstances within the officer's personal knowledge to warrant a reasonable person's belief that the suspect had committed an offense." *In re License Suspension of Cybulski*, 2008 MT 128, ¶ 26, 343 Mont. 56, ¶ 26, 183 P.3d 39, ¶ 26. The record of both the trial and the suppression hearing establishes that particularized suspicion and probable cause were present in this case.

¶12 Fourth, Ditton maintains that the District Court erred when it denied him a waiver of the Gallatin County Sheriff's service of witness subpoena fee upon his application and accompanying affidavit of indigency. We agree with the State that this argument is unsupported as required under M. R. App. 12(1)(f). Thus, we decline to address it.

¶13 Fifth, Ditton argues that the District Court erred when it refused to consider the constitutionality of Montana's "Media Confidentiality Act," Title 26, chapter 1, part 9, MCA. Ditton sought to subpoena Ted Sullivan (Sullivan), a crime reporter for the *Bozeman Daily Chronicle* who had written an article about Ditton's arrest. Ditton claimed that he needed Sullivan's testimony to impeach some of the testimony against him. However, the *Bozeman Daily Chronicle* had filed a motion to quash Sullivan's subpoena based on the protections extended to media outlets under the aforementioned act. In the middle of his bench trial, Ditton sought to challenge the constitutionality of this statute. The District Court held that the Media Confidentiality Act was clear on its face and prohibited the compelled testimony of the crime reporter. Ditton argues that this denial constituted "harmful error" by denying him his Sixth Amendment right to confront

6

the witnesses against him, as well as his due process rights under the Fourteenth Amendment.

¶14 "Structural error is that type of error that affects the framework within which the trial proceeds, rather than simply an error in the trial process itself." *State v. Van Kirk*, 2001 MT 184, ¶ 38, 306 Mont. 215, ¶ 38, 32 P.3d 735, ¶ 38 (quotation and alteration omitted). Structural errors include those related to the jury selection process, total deprivation of the right to counsel, and the lack of an impartial trial judge. *Van Kirk*, ¶ 39. "Trial" error, by contrast, "is that type of error that typically occurs during the presentation of a case to a jury." *Van Kirk*, ¶ 40. Giving Ditton the benefit of a doubt under the circumstances at bar, the "error" of which Ditton complains would fall into the "trial" error category. Accordingly, in order to prove that such error was "harmless," the State must show that there is no reasonable possibility that the error might have contributed to Ditton's conviction. *Van Kirk*, ¶ 47.

¶15 We agree with the State that *Slavin* is inapplicable, and that the denial of Ditton's challenge was, at best, harmless error. As the State explains, Ditton claimed during his trial that the case against him hinged on the credibility of the two officers who initially detained him. Sullivan had written two articles for the *Bozeman Daily Chronicle* quoting these two officers. Ditton claimed that the officers would deny making the statements attributed to them in the articles and that their testimony would be relevant impeachment evidence. However, both of the articles were admitted into evidence and neither of the officers who initially questioned Ditton were called to testify. Moreover, the officers and witnesses who did testify provided ample evidence to support Ditton's conviction. Under

these circumstances, there is no reasonable possibility that any error in excluding Sullivan from testifying contributed to Ditton's conviction.

¶16 Sixth, Ditton argues that he made a prima facie showing of entrapment, and that the District Court erred in precluding him from presenting evidence in support of an entrapment defense. However, Ditton has failed to present any evidence to invoke the affirmative defense of entrapment, and the District Court did not err in denying Ditton's attempts to argue this defense. *See State v. Sweet*, 1998 MT 30, ¶ 22, 287 Mont. 336, ¶ 22, 954 P.2d 1133, ¶ 22 (setting forth the elements of the entrapment defense).

¶17 Next, Ditton argues that the District Court erred in denying his motion for a directed verdict at the close of the State's case-in-chief. Again, Ditton asserts that there was insufficient evidence presented at trial to sustain his conviction. These contentions are without merit. A motion for a "directed verdict" or "directed verdict of acquittal" is more appropriately entitled a motion to dismiss for insufficient evidence. *State v. Farmer*, 2008 MT 354, ¶ 6, 346 Mont. 335, ¶ 6, 195 P.3d 800, ¶ 6. The evidence in this case was more than sufficient to support the charge of misdemeanor assault, and the State proved each element of this offense beyond a reasonable doubt. Thus, we reject Ditton's challenge to his conviction in this regard as well.

¶18 Additionally, Ditton maintains that the District Court erred when it admitted evidence of the suspension of his Virginia law license based on his display of "a long history of unlawful and criminal conduct and abuse of legal process." We review evidentiary rulings for an abuse of discretion. *State v. Stearns*, 2008 MT 356, ¶ 13, 346 Mont. 348, ¶ 13, 195 P.3d 794, ¶ 13. As the State points out, Ditton "opened the door" to

8

cross examination about the suspension of his Virginia law license by himself testifying about the fact that he was an attorney in Virginia. Thus, the District Court did not abuse its discretion in admitting this evidence.

¶19 Finally, we turn to Ditton's contention that the District Court erred in denying his motion to dismiss for lack of a speedy trial. The District Court analyzed this motion under the four-factor speedy trial analysis from *State v. Ariegwe*, 2007 MT 204, 338 Mont. 442, 167 P.3d 815. With respect to factor one, the length of the delay, *see Ariegwe*, ¶ 38, the District Court found that the date of Ditton's District Court trial was 62 days beyond the 200-day trigger date. Accordingly, the State did not have to show a particularly compelling justification for the delay, whereas Ditton was required to make a highly persuasive showing that he was prejudiced by the delay. *See Ariegwe*, ¶ 49.

¶20 With respect to factor two, reasons for the delay, *see Ariegwe*, ¶¶ 63-67, the District Court found that of the 262-day interval between Ditton's notice of appeal to the District Court and his actual date of trial, 217 days were attributable to the State as institutional delay, while 45 were attributable to a valid reason. Although the District Court found that this factor weighed slightly in Ditton's favor, on balance this factor weighed against the conclusion that Ditton was deprived of his right to a speedy trial because the delay was institutional and for a valid reason.

¶21 Turning to factor three, defendant's response to the delay, *see Ariegwe*, ¶¶ 79-85, the District Court concluded that this weighed in the State's favor given Ditton's knowledge of the legal system, his acquiescence in the proceedings, his filing of multiple pretrial motions and pleadings, and his failure to appear at several omnibus hearings.

9

Finally, with respect to factor four, prejudice to the accused, *see Ariegwe*, ¶¶ 86-88, the District Court found that this factor also weighed against a violation of Ditton's right to a speedy trial because Ditton was not prejudiced by the delay, was not subject to oppressive pretrial incarceration, suffered no additional anxiety and concern other than that inherent in being charged with assault and proceeding through the criminal justice system, and was not significantly impaired in his ability to present his defense. Balancing the factors, the District Court concluded that factors one, three, and four weighed in the State's favor, while factor two weighed slightly in Ditton's favor but was to be accorded little weight because the delays by the State were neither intentional nor in bad faith. Accordingly, the District Court found that Ditton was not deprived of his right to a speedy trial and denied his motion to dismiss.

¶22 In his argument before this Court, Ditton has failed to show that the District Court's findings of fact in support of this decision were clearly erroneous, or that its conclusions of law were incorrect. *See Ariegwe*, ¶ 119. Thus, we affirm the District Court's denial of Ditton's motion to dismiss for lack of a speedy trial.

¶23 We have determined to decide this case pursuant to Section 1, Paragraph 3(d) of our 1996 Internal Operating Rules, as amended in 2003, which provides for memorandum opinions. It is manifest on the record before us that the District Court did not err in its disposition of this matter and that evidence against Ditton established the crime of misdemeanor assault beyond a reasonable doubt. Therefore, we affirm.

/S/ PATRICIA COTTER

We concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JIM RICE
/S/ BRIAN MORRIS