FILED

10/27/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0433

DA 18-0433

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 272N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

NATHAN MAHSEELAH,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
                In and For the County of Lake, Cause No. DC-17-290
                Honorable James A. Manley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Moses Okeyo, Assistant Appellate
          Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant
          Attorney General, Helena, Montana

          Steven N. Eschenbacher, Lake County Attorney, Benjamin R. Anciaux,
          Deputy County Attorney, Polson, Montana

Submitted on Briefs: July 8, 2020

Decided: October 27. 2020

Filed:

_____

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section 1, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 On September 15, 2017, the State charged Nathan Mahseelah with one count of robbery pursuant to § 45-5-401, MCA, a felony, one count of assault with a weapon pursuant to § 45-5-213, MCA, a felony, and two counts of criminal endangerment pursuant to § 45-5-207, MCA, both felonies.[1] Ultimately, the jury trial was set for March 5, 2018. The State submitted its list of witnesses and exhibits on January 22, 2018. Mahseelah filed his list of witnesses and exhibits on February 22, 2018, which listed "All witnesses identified by the State" and "Additional witnesses as they become known to the Defendant." Mahseelah did not identify any specific witnesses at that time.

¶3 On March 3, 2018, defense counsel was informed by Mahseelah of a witness who was present on the night of the alleged crimes, Michael Steele (Steele). The defense disclosed Steele as a witness to the prosecutor the morning of trial, March 5, 2018. Mahseelah submitted a trial memorandum supporting his request to call Steele for the defense, maintaining that Steele's testimony would have a material bearing on the outcome

---

[1] One count of criminal endangerment was dismissed prior to trial.

of the trial. The State objected. The District Court heard testimony from Steele outside the presence of the jury.[2]

¶4 The District Court excluded Steele's testimony at trial because Mahseelah had known about this witness for about three weeks, and only disclosed the witness to his counsel two days before trial. The District Court determined that it was prejudicial for the defense to disclose the witness to the State the morning of trial.

¶5 At trial Casey Joe Couture (Couture), an officer for the Confederated Salish and Kootenai Tribes, testified about his investigation of the shooting on August 27, 2017. He was notified by dispatch that there was a shooting in the Felsman Addition in Pablo, Montana, around 6:00 p.m., and that a little girl had almost been shot. Initially Couture went to the homes of family members of the child. He located where the bullet entered and found that the bullet lodged in the wall inside the child's room near her bed.

---

[2] Steele testified that he and Mahseelah were offered a ride by Angelina Dempsey (Dempsey) on the night of the alleged crimes. Steele and Mahseelah rode with Dempsey to Pablo and went to the Felsman housing complex. Steele explained that Mahseelah was going there on personal business to retrieve his cell phone from Jay Sorrell's (Sorrell) home. When the parties arrived at Sorrell's home, Dempsey went to retrieve Mahseelah's phone from inside the home but was unsuccessful. Dempsey advised Mahseelah to go speak to Sorrell. Steele testified that he and Mahseelah then went into the home. Steele stopped in the living room and Mahseelah went into the back room to speak with Sorrell. There were two unknown people in the living room along with Steele's cousin William Steele. Steele described the strangers as "light complected" and "around [his] age or younger." Steele then exited the home and waited on the porch with Dempsey. A few minutes later, Steele heard a "boom," which he described as multiple gun shots. Then, after about five minutes, Mahseelah exited the home. Dempsey, Steele, and Mahseelah then left the premises in Dempsey's vehicle. Steele was asked whether Mahseelah was carrying a gun, and he explained that he could tell that Mahseelah was not carrying a gun because, "[Mahseelah] had shorts and a t-shirt on." Steele told the court that he advised Mahseelah at the beginning of February that he would provide a statement on his behalf.

On cross-examination, Steele testified that he and Mahseelah were in the same pod at the jail for 21 days prior to trial. Steele testified that he told Mahseelah "within probably the first week" he would provide a statement about the events that occurred on August 27, 2018.

¶6     Couture spoke with the neighbors. He testified one neighbor explained that he heard the shots that evening, saw where they came from, and recognized the vehicle coming and going from the house the shots came from. Couture testified that the neighbor told him the shots came from Sorrell's home, and the vehicle was "a goldish-colored Ford Fusion that [had] some body damage on it." The neighbor told Couture that Dempsey owned the vehicle. Defense counsel did not object to these questions.

¶7     Couture was in radio communication with Lake County Dispatch, The Confederated Salish and Kootenai Tribe's Dispatch, Lake County, Montana Highway Patrol, and other tribal officers. Couture learned of two possible locations for Dempsey. Officer Ben Asencio (Asencio) advised Couture that he found Dempsey's vehicle at 41424 Northwood Road in Pablo. When Couture reached the vehicle, he spoke with Dempsey. Dempsey told him that she left Sorrell's house because of the shooting.

¶8     The State questioned Couture about his communications with witnesses at the scene. He stated that he identified two witnesses who were present when the shooting occurred, Ishan Wilie (Wilie) and William Steele (William), and both witnesses identified Mahseelah as the shooter. Defense counsel objected when the State began to ask whether the witnesses identified the shooter but did not object when Couture was questioned about whether statements were made by the witnesses about their own presence during the shooting. The District Court ruled that the statements were not hearsay as they were not offered for the truth of the matter asserted, but rather to show the progression of the investigation.

¶9     The State admitted multiple exhibits through the officer, showing bullet holes both in the home where the shooting occurred as well as in the nearby home that was breached

4

by the bullets. One of the bullets landed in a child's bedroom, and another grazed a baby's head who was sitting outside on a porch. Couture also described the conversations he had with the mother of the child in the bedroom where the bullet came to rest. Finally, he explained that he did not locate Mahseelah the day of the shooting but did locate him approximately one week later. Defense counsel did not cross-examine Couture.

¶10 Dempsey testified that Mahseelah was her nephew. Dempsey stated that she went to the Felsman Addition in Pablo around 6:00 p.m. on August 27, 2017, but Mahseelah was not with her. Dempsey knew Sorrell as the resident of the house. Dempsey explained that she was aware that Mahseelah made a statement to the police that she had driven him to Sorell's home. Dempsey did not know why Mahseelah would lie about riding with her to Sorrell's home. Dempsey testified that she did not remember hearing gunshots but did remember "[going] along with him" referring to Asencio telling her there was a shooting. The State questioned Dempsey in depth on her departure from the scene, which was characterized as her leaving rather quickly. She explained that she was leaving to find her son and her partner, and that she did not speed out of the driveway, but conceded that she did advise the man trying to stop her from leaving to "get the hell out of [her] way." While Dempsey told both officers shortly after the incident that she left the scene because of the shooting, she testified at trial that she did not remember making those statements.

¶11 The State called witnesses to testify about the bullets entering their homes, including the young girl with a bullet in her bedroom and her mother. The State also called Erica Vigil, the mother of the two-year-old boy whose hair the second gunshot went through. She stated that the bullet hit the siding of her house after grazing her child's head. Vigil

5

saw the gold car at Sorrell's home and stated that she saw Wilie and Benny Finley (Finley) at the home. The State called Jonathan Charlo (Charlo), Sorrell's next-door neighbor, to testify. Charlo explained that after the shooting he saw Dempsey, Finley, and two other people enter Dempsey's vehicle. Charlo was blocking Dempsey's vehicle, but eventually moved as to not get run over.

¶12 Wilie testified that she owned the home in the Felsman Addition where the shooting occurred with her now ex-husband Jay Sorrell, and that she was present on the night of the shooting. Wilie testified that her brother William and Sorrell were also present in the home and that Dempsey was the only person who visited the house that evening. When questioned about giving Couture a statement the evening of the shooting, Wilie agreed that she and William had provided statements to Couture.[3] Wilie acknowledged that on the evening of the shooting she told Couture that Mahseelah came into her house and shot a gun into the bedroom. She stated that she was scared when she spoke to the police, and acknowledged she told them that Mahseelah was the shooter. In court she claimed that she made up that statement because she was high on methamphetamine and scared for herself and her family.

¶13 Wilie testified that she heard two more shots after the first one. Then she began yelling for Sorrell to see if he was okay, and she remembered that she had Mahseelah's phone. She grabbed the phone, cracked the door, and threw the phone down the hallway.

---

[3] These statements were not introduced into evidence but discussed in Wilie's testimony as well as Couture's testimony. William's statement to Couture corroborated Wilie's account of the incident and identified Mahseelah as the shooter.

She testified that she "yelled for whoever it was just to leave, please, and then [she] closed the door." She saw two other people in the home that she didn't recognize, one male and one female.

¶14 As the only witness for the defense, Mahseelah testified that on August 27, 2017, he travelled from Polson to Pablo with Dempsey and Steele to his cousin Sorrell's home. He had a "cell phone that came up missing" and knew that it was at Sorrell's home. Mahseelah stated that Dempsey went into the home first because he was upset and felt that Dempsey may have been able to handle the situation better. Dempsey went back outside because she could not get the phone. Mahseelah and Michael Steele then went inside the home and saw two people in the living room that Mahseelah did not recognize. Mahseelah also saw that Wilie and William Steele were in the home, along with Sorrell. Mahseelah conversed with Sorrell then heard a shot go off, then two more shots. Mahseelah's phone "rolled from the master bedroom down the hallway," and he picked it up. Mahseelah then left the residence with Dempsey and Michael Steele in Dempsey's vehicle.

¶15 Mahseelah testified that at the time of the incident he told Wilie to lie to the police and say that he was the shooter in order to protect his cousin Sorrell who had an outstanding warrant. On cross-examination Mahseelah maintained that he was not able to go into great detail when he advised Wilie at the scene, and that he did not speak to William. He testified that he did not see the shooter, but through questioning identified everyone who was not the shooter including Sorrell, Dempsey, William, the two people in the living room, as well as Michael Steele.

¶16 Mahseelah argues on appeal that the District Court erred in admitting hearsay statements identifying him as the shooter and further that the use of a testimonial hearsay statement against him violated his Sixth Amendment right to confront witnesses against him, that the State produced insufficient evidence, that the District Court erred by excluding testimony of a critical eyewitness, and that the State claimed it had witnesses who would testify they saw him discharge a gun and did not produce those witnesses.

¶17 We review rulings on the admissibility of evidence to determine whether the district court abused its broad discretion. *Clark v. Bell*, 2009 MT 390, ¶ 16, 353 Mont. 331, 220 P.3d 650 (citations omitted). "We review questions concerning the sufficiency of evidence in a criminal matter to determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Spottedbear*, 2016 MT 243, ¶ 8, 385 Mont. 68, 380 P.3d 810. A district court abuses its discretion if it acts arbitrarily without employing conscientious judgment or exceeds the bounds of reason and ignoring the action will result in substantial injustice. *Neal v. Nelson*, 2008 MT 426, ¶ 16, 347 Mont. 431, 198 P.3d 819 (citation omitted).

¶18 This Court rarely invokes plain error review, and will only do so where the error claimed implicates a party's fundamental constitutional rights and if failing to review the claimed error at issue will (1) result in a manifest miscarriage of justice; (2) leave unsettled the question of fundamental fairness of the trial or proceedings; or (3) compromise the integrity of the judicial process. *State v. Daniels*, 2019 MT 214, ¶ 30, 397 Mont. 204, 448 P.3d 511 (citations omitted). If the issue is unpreserved in the record, requesting a review

under the plain error doctrine is not sufficient. *State v. Norman*, 2010 MT 253, ¶ 17, 358 Mont. 252, 244 P.3d 737. The appealing party must "firmly convince" this Court that failure to review the error clearly implicates a party's fundamental constitutional right. *Norman*, ¶ 17.

¶19 Mahseelah argues on appeal that the District Court erred in admitting hearsay evidence elicited from Couture that identified Mahseelah as the shooter.[4] Hearsay is a statement repeated by someone other than the declarant at trial and offered to prove the truth of the matter asserted. M. R. Evid. 801(c).

¶20 Wilie's statements to Couture were contrary to her statements at trial. Specifically, Wilie made a statement to Couture at the scene of the incident that Mahseelah was the shooter, and during her court testimony she acknowledged telling police that version, but in court claimed that she was mistaken in her prior statement due to being high on methamphetamine. Defense counsel cross-examined Wilie regarding her prior inconsistent statement. William Steele's statement to the officer that Mahseelah was the shooter could not be cross-examined as he did not testify at trial.[5]

¶21 Mahseelah fails to demonstrate that the District Court abused its broad discretion in admitting Wilie's witness statements through Couture. Wilie's statement out of court to

---

[4] Mahseelah argues that the State told the jury that it could "use these out-of-court statements for the truth of the matter" in both opening and closing statements. Defense counsel did not object during opening or closing, and this Court did not find any point in the record where the State made such assertion in opening statement or closing argument.

[5] On February 16, 23, and 26, 2018, the State subpoenaed William Steele to appear at the March 5 trial. None of the subpoenas were served on William Steele.

Couture was a prior inconsistent statement. Hearsay is inadmissible unless the statement falls under one of the exceptions to hearsay. M. R. Evid. 802. A statement is not hearsay if is a prior statement made by a witness who is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony. M. R. Evid. 801(d)(1)(A); *State v. Lawrence*, 285 Mont. 140, 159, 948 P.2d 186, 198 (1997).

¶22 Mahseelah argues that there was insufficient evidence provided by the State to sustain his convictions. Specifically, that the convictions rested solely on Wilie's prior inconsistent statement. Couture described in detail the course of his investigation throughout the evening of August 27, 2017. He recounted statements from multiple witnesses from the incident including a neighbor, the mother of the young girl, and two witnesses. Defense counsel did not object to any of the questioning by the State about the statements of these witnesses until the State asked whether the two witnesses present in the home identified the shooter.

¶23 The admission of William Steele's statement through Couture after objection was error. While this statement falls under the definition of hearsay and is not subject to an exception of the rules precluding hearsay testimony, we find that it is cumulative and thus harmless error. *State v. Kirk*, 2001 MT 184, ¶ 43, 306 Mont. 215, 32 P.3d 735. Mahseelah by his own testimony placed himself at the scene of the incident at the time of the shooting. He corroborated much of the testimony of other witnesses including that he travelled with Dempsey and Michael Steele to Sorrell's home to retrieve his cell phone. Mahseelah testified that he saw Wilie and William Steele in the home and that he heard three gunshots

10

while he was there. Wilie acknowledged she told investigators Mahseelah was the shooter. During Mahseelah's testimony, there were multiple references to lying and advising other witnesses, including Wilie, to lie. There was extensive testimony from multiple parties including Mahseelah himself that the jury could consider to conclude that he was guilty.

¶24 Mahseelah argues for the first time that the District Court violated his right to confront witnesses against him under the Sixth Amendment to the United States Constitution by allowing the investigating officer to repeat the statement made by William at the scene of the incident asserting that Mahseelah was the shooter. In order for us to analyze a constitutional question with a review of plain error, we must be convinced that Mahseelah's fundamental constitutional rights were clearly violated; requesting review is not enough. *Norman*, ¶ 17.

¶25 Here, the issue was not preserved at trial. We agree that William's statement was offered for the truth of the matter asserted, and that it was not subject to cross-examination. As noted, the statement was cumulative to testimony of another witness which placed Mahseelah at the crime scene when the crime was committed, as well as Mahseelah's own testimony. Further, Wilie acknowledged she told the investigators Mahseelah was the shooter. We are not convinced that Mahseelah's fundamental rights were clearly violated and decline to exercise plain error review under these facts.

¶26 Mahseelah argues that the District Court abused its discretion by not allowing Michael Steele to testify at trial. Section 46-15-323(6), MCA, requires that Mahseelah provide the State all names, addresses, and statements within 30 days of the arraignment "or at a later time as the court may for good cause permit." Section 46-15-329, MCA,

11

provides a mechanism for the court to enforce discovery provisions through sanction, including precluding a party from calling a witness. When Steele testified in camera, he stated many of the same facts that Mahseelah himself, as well as others, testified to later at trial. The defense previously disclosed no specific witnesses during discovery. Mahseelah knew about three weeks prior to trial that Michael Steele would make a statement for him yet did not disclose him as a witness to counsel until Saturday, two days before the trial started. The State was apprised of the witness the morning of trial. The District Court weighed the witness's testimony with the prejudice to the State of the late notice and considered the length of time Mahseelah knew about the witness prior to disclosure. *State v. DeMary*, 2003 MT 307, 318 Mont. 200, 79 P.3d 817.

¶27     In *DeMary*, the Defendant waited until five days before his trial to call a witness whom he claimed was essential to his defense. *DeMary*, ¶ 16. DeMary knew about the witness for over a year before he disclosed her. *DeMary*, ¶ 15. Mahseelah argues that defense counsel disclosed Michael Steele to the court as a witness as promptly as possible, which is shown by the record to be the case, but Mahseelah personally knew at least three weeks prior to trial about the witness's willingness to testify for him. In *State v. Strang*, the State made a late disclosure of a witness and was allowed to call the witness because by no fault of the State, it was unaware of the facts to which the witness would testify, and—when the State disclosed the witness—defense counsel had ten days to interview the witness and seek possible rebuttal witnesses. *State v. Strang*, 2017 MT 217, ¶ 36, 388 Mont. 428, 401 P.3d 690. Mahseelah disclosed his late witness to the District Court and the State the morning of trial, after the jury had been selected. Different from *Strang*,

12

where counsel had ten days to interview the witness and find possible rebuttal witnesses, Mahseelah left no time for the State to begin the process of assessing Michael Steele's testimony through investigation. Like *DeMary*, where the Defendant knew about the possible witness for a year before disclosure, Mahseelah knew at the time of the incident that Steele was a possible witness and yet did not disclose his existence to his attorney. Mahseelah testified at trial that Michael Steele was in Dempsey's vehicle with him and went into Sorrell's home. The District Court did not abuse its discretion in precluding Steele's testimony.

¶28 We have determined to decide this case pursuant to Section 1, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶29 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE